Filed 12/18/24  P. v. Moreno CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082974 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS320086) |
| ISRAEL MORENO, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed.

Robert L. S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers, Alana R. Butler, and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

Israel Moreno, Jr. appeals the judgment after a jury convicted him of the first degree murder of Marquis Hargrove (Pen. Code, § 187, subd. (a))[1] and found true the allegation that he personally used a firearm causing great bodily injury and death to another (§ 12022.53, subd. (d)).  Moreno makes two main contentions on appeal.  First, when the trial court was instructing the jury, it failed to read CALCRIM No. 640 aloud.  Moreno argues that although the written version of the instruction was provided to the jury, we must presume the jury was not aware of the instruction.  He further contends that this error was prejudicial and requires reversal of the judgment.  Second, Moreno contends that the trial court incorrectly stated the law in its written response to jury questions during deliberations, and its amended response did not cure the prejudicial error.

We conclude that the trial court's failure to read the instruction to the jury was not prejudicial error.  We further conclude that Moreno forfeited his argument regarding the trial court's response to the jury questions because his counsel agreed with both the initial and amended response.  We therefore affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 2023, Moreno was charged with one count of murder (§ 187, subd. (a)) after he shot and killed Hargrove, his friend and the romantic partner of his cousin.  The information further alleged that Moreno personally used and discharged a firearm in the commission of the murder, causing great bodily injury and death to another (§§ 12022.5, subd. (a); 12022.53, subd. (d)).  After an 11-day trial, a jury found him guilty of first degree murder and found the

_____

[1]     Undesignated statutory references are to the Penal Code.

2

gun enhancement within the meaning of section 12022.53, subdivision (d) to be true.

A. *The Prosecution's Case*

Moreno's cousin Jovana A. met Marquis Hargrove when she was 16 years old. They started a romantic relationship and had a son together in 2020. They were together for about four years before Hargrove was killed. The couple had a toxic relationship that involved physical and emotional abuse. Hargrove often got violent and hit Jovana, disrespected her, and tried to prostitute her. At one point, Jovana obtained a restraining order against Hargrove, and at another point, Hargrove obtained a temporary restraining order against Jovana and was awarded temporary custody of their son.

Moreno, Jovana, and their families were all very close. Moreno met Hargrove through Jovana. Moreno and Hargrove were "like brothers" for a long time. In November 2020, Moreno and Hargrove had a falling out when they and Jovana were detained during a traffic stop and a gun was found in the car. Moreno was released but Hargrove and Jovana were arrested. Hargrove accused Moreno of being a snitch, which upset Moreno.

Moreno was aware of Hargrove's abuse and tried more than once to convince Jovana to leave him. At some point when Jovana and Hargrove were temporarily broken up, the two got into another argument. Hargrove had broken Jovana's phone, so Jovana was using her cousin's phone, and Hargrove threw it out the window. He called Jovana and her cousin names. Apparently in response to this event, Moreno got angry and threatened to "smoke" Hargrove for disrespecting his two cousins.

At some point the rift between Moreno and Hargrove seemed to be repaired, and in October 2021, Moreno, Jovana, Hargrove, Jovana's close friend Emily S., and Hargrove's friend Maximo G. all went out together one

night. They drove to a hotel, where they started drinking and smoking marijuana. The five of them became intoxicated and continued partying throughout the night, heading to some parties, a night club, and finally another house party at around 2:00 or 3:00 a.m. Hargrove was carrying a gun on him that night.

At the last house party, Hargrove started dancing with another woman, and Jovana got upset and walked out. Hargrove, Moreno, Emily, and Maximo followed Jovana out of the house and down the street. While the group was following Jovana, Hargrove hid his gun behind a truck tire. Jovana was crying and everyone was trying to calm her down.

Jovana and Hargrove soon started arguing as they walked down the street. According to Maximo, Jovana started hitting Hargrove. After about 10 minutes of the group chasing Jovana, Hargrove told Moreno, "go get my gun." So Moreno walked back, retrieved the gun from behind the truck tire, placed it in his waistband, and then rejoined the group. Right after Moreno returned, Maximo saw Hargrove grab Jovana by the neck and push her. Maximo then left the group because "it was just too much." He started walking in the opposite direction and called his mother for a ride home.

Emily testified that as the couple was fighting that night, Jovana "would push [Hargrove], and he would retaliate with slapping her or pushing her off." Jovana got very upset and accused Hargrove of trapping her by getting her pregnant. She attempted to slap Hargrove in the face, but he backhanded her across her face before she could touch him, causing her head to turn.

Hargrove and Jovana continued arguing, and Hargrove told her that he was done with her and was going to take her son away. Hargrove continued grabbing Jovana by her arms and shoving her back. Emily testified that she

4

and Moreno repeatedly tried to intervene but could not "get [Hargrove] off [Jovana]" because he "was already too upset." Emily and Moreno told Hargrove to leave Jovana alone because she was calming down, but he would not. Hargrove was also repeatedly shaking Jovana with "extreme force." He was "egging her on," trying to make her sound "like a lunatic."

As the group walked down the street, Emily heard Moreno tell Hargrove that if he did not leave Jovana alone, "I'm going to pop you," which Emily understood to mean shoot him. The four stopped on a street corner as Hargrove and Jovana continued arguing. Both were saying they did not want to be with each other anymore, and Hargrove again threatened Jovana that she would not see her son anymore. Jovana then tried to run at Hargrove to hit him in the face, but Hargrove backhanded her across her face again before she could touch him, causing her to twirl and almost fall.

It was at this point Emily heard the first gunshot and turned to see both Moreno and Hargrove running. She saw Moreno with a gun and heard two more shots, then she ran to Jovana. Jovana screamed at Moreno to stop. Hargrove was between two cars trying to run to Moreno, and Emily thought "he was going to beat [] Moreno's ass." Moreno then turned around and shot Hargrove again. Emily saw Moreno shoot twice and then run away after Hargrove fell down. Hargrove got up and ran towards Jovana, then fell again. Emily saw blood on Hargrove and called 911.

When police officers arrived at the scene of the shooting, Hargrove was lying on his back on the ground bleeding. Jovana and Emily were both near him; Jovana was hysterically crying and both women were screaming. Hargrove was taken to the hospital with multiple gunshot wounds. He was rushed to an operating room but pronounced dead about 45 minutes later.

At the scene, officers found six nine-millimeter casings along with Hargrove's cell phone.  They later found Hargrove's gun and confirmed that all six of the casings found at the scene came from the gun.

The medical examiner found eight perforating gunshot wounds in Hargrove's body, with five of the entrance wounds on the front of his body and three on the back.  The examiner testified that all eight of the perforating gunshot wounds could be accounted for even if only six bullets were used, because two of them were aligned with other wounds and thus likely caused by one bullet each.

After Moreno was arrested and while he was incarcerated, the police observed a tattoo on his lower body of Hargrove's nickname "Kece" with an "x" through it.

B. *The Defense*

Moreno testified on his own behalf.  He grew up with Jovana, who was his cousin, and had a close relationship with her.  Moreno met Hargrove through Jovana, who started dating Hargrove when she was 16 years old, and he and Hargrove became good friends.  The relationship between Hargrove and Jovana was good at first, but at some point Hargrove began physically and mentally abusing Jovana.  At first, he "would just manhandle her," and then later he started smacking her.  Moreno witnessed Hargrove abusing Jovana both when Hargrove was drinking and when he was sober, and he described Hargrove as a bully who always carried a gun.  Moreno tried unsuccessfully to convince Jovana to leave Hargrove.

About a year before the shooting, Moreno and Hargrove had a falling out after the traffic stop where Hargrove was arrested for possession of a firearm.  Hargrove posted on social media that Moreno was a snitch, and Moreno responded by saying he saw Hargrove crying when he was being

6

handcuffed.  The two stopped speaking for a few months but eventually restored their friendship after Hargrove apologized.

Before they became friends again, Moreno and Hargrove argued via text message about Hargrove refusing to return Moreno's cousin's phone after breaking Jovana's phone.  Moreno called Hargrove a "bitch," and Hargrove said, "At this point, you're causing deaths."  Moreno understood that to mean Hargrove was going to try to kill him, one of his cousins, or all three of them, so Moreno responded that he would "smoke" Hargrove.  Hargrove responded to the text with laughing emojis and did not take Moreno's threat seriously.

Two days before the shooting, Moreno saw Hargrove punch Jovana in the lip hard enough that her head cocked back.  This made Moreno angry, but he did not say anything because he was scared of Hargrove.  Hargrove was much bigger than Moreno and had his gun on him at all times.

On October 30, Moreno, Hargrove, Jovana, Emily, and Maximo were at the house party when Jovana became angry with Hargrove for dancing with another girl and walked out of the house.  Moreno and Hargrove found Jovana and Emily in an alley near a parking lot, where Jovana was crying. Jovana said she wanted to leave, but Hargrove told her, "You're not going nowhere," and the two began arguing.  Jovana ran at Hargrove, but he forcefully backhanded her before she got to him.  Jovana never actually hit Hargrove, but he smacked her about four times.  He threw her around and she fell a few times.  At one point, she got up after falling and started sprinting away from the group.

Moreno suggested to Hargrove that he get Jovana and Emily an Uber to Emily's house to get Jovana away from the situation.  Hargrove responded, "Nah, fuck that.  She's not going nowhere."  The group eventually caught up to Jovana, who had fallen again, and Hargrove laughed at her.  Jovana tried

7

to run at him again, and Hargrove slapped her a few more times.  Moreno and Emily repeatedly tried but failed to separate Hargrove and Jovana.  They also repeatedly yelled at Hargrove not to hit Jovana, but he did not stop hitting her.  At some point that night, Moreno told Hargrove: "If you touch [Jovana] again, I'll pop you."

Jovana tried to run at Hargrove one more time, and Hargrove punched her, causing her whole body to turn.  This is when Moreno pulled out Hargrove's gun, which Hargrove had hidden and then told Moreno to retrieve from the truck earlier in the night.  Moreno was concerned for Jovana's safety and thought Hargrove was going to continue beating her.  He pointed the gun at Hargrove, intending to scare him.  Hargrove saw the gun and came at Moreno, trying to grab the gun.  Moreno got scared, thinking that if Hargrove took the gun from him, he would shoot Moreno, so he shot Hargrove twice.  Hargrove took two steps back, then made an angry growl and charged at Moreno.  Moreno shot two more times and then ran away.  As Moreno was running, Hargrove was catching up to him.  Moreno thought Hargrove was going to try to tackle him, take the gun from him, and shoot him, so Moreno turned around fast and shot two more times before turning back around and running down the street.

Moreno ran back to the house party and told a woman he did not know that he needed a ride home and it was an emergency.  She asked him why he had a gun and told him to get rid of it, so he threw it out the window as she was driving him home.  When he arrived home, he told his parents what happened and called the police to tell them he shot someone in self-defense.  He then drove to the police station with his parents to turn himself in.  He helped the police locate the gun and then was arrested.

While in custody, Moreno tattooed Hargrove's nickname on his right upper thigh and struck it out.  He struck the name out because he was mad at himself, Hargrove, and Jovana for the situation he was in.  Moreno stated the tattoo was a reminder of the mistakes he made and a reminder not to make the same mistakes again.

C. *Jury Instructions and Questions*

At the close of evidence, the prosecution submitted a packet of proposed jury instructions.  Defense counsel did not submit any additional instructions, stating that he thought what the prosecution submitted covered what he needed to request.  Before counsel gave their closing arguments, the court and counsel for the parties had a final jury instruction conference where they reviewed all of the proposed instructions, including CALCRIM No. 640: "Deliberations and Completion of Verdict Forms: For Use When Defendant Is Charged With First Degree Murder and Jury Is Given Not Guilty Forms for Each Level of Homicide."  The court stated: "Then comes 640, which deals with the sequencing of their decision-making.  I think that's okay."  No further comments regarding CALCRIM No. 640 were made during this conference.

The trial court instructed the jury, stating at the outset: "And you will receive from me when you go to the jury room a complete set of the instructions in writing, so that's arguably my most important responsibility to make sure you are accurately, completely and correctly instructed on the applicable law.  [¶]  Understanding that some of the instructions you receive here now orally in the courtroom are in the written set, some of those instructions may or may not apply depending on your finding concerning what facts have been proved to you by the evidence."  The court further

9

instructed the jury: "[O]ne of the first things you should do is review in some detail the written instructions that you will have with you . . . ."

The court then read the instructions to the jury, paraphrasing many of them.[2] Apparently by inadvertence, the court did not read CALCRIM No. 640 to the jury along with the rest of the instructions. Neither party objected to this omission from the court's oral instructions.

The prosecutor then gave her closing argument. Near the end, she stated: "Now, what the Court didn't read to you – and I imagine that he will – is the last instruction that you're going to get in your packet tells you how to deal with the verdict forms"—seemingly referencing CALCRIM No. 640. It appears the court never gave the last instruction orally, but provided it to the jury in written form. Neither party raised the issue again.

During deliberations, the jury sent one note to the court seeking clarification on the law and a second note requesting testimony readback. The jury's first note had three questions: (1) "In considering 1st degree murder, do we need to consider express v. implied malice?"; (2) "Is the definition of express malice the same as willful, deliberate, and pre-meditated?"; and (3) "Do we have to unanimously agree on expressed [sic] v. Implied [malice] for 1st degree murder?" The court conferred with counsel for both parties, and everyone eventually agreed with the following response: "Responses to Jury Note #1: Question #1: Yes. See Cal Crim Instruction 520. Question #2: No. See Cal Crim instruction 521. Question #3: No[.]"

The next morning, the prosecutor informed the trial court and defense counsel on the record that, after researching the issue, she believed the

---

[2] We caution the trial court against paraphrasing the standard CALCRIM instructions. Even a minor deviation can result in an inadvertent misstatement of the law. Courts should avoid straying from the text of the written instructions.

10

response to the jury was an incorrect statement of law. The court agreed. The prosecutor proposed a corrected response, which defense counsel agreed with. The court adopted the prosecution's proposed response and sent the following to the jury: "FURTHER RESPONSE TO JURY NOTE #1: 1. All murder requires you to find that the Defendant acted with malice. Malice may be expressed or implied. A finding of first-degree murder requires a finding of express malice as well as that it was committed willfully, deliberately, and with premeditation. A complete statement of the elements of murder in the first and second degree can be found in CALCRIMs in 520 and 521, read in conjunction with the entirety of jury instructions you were provided. 2. No. See CALCRIM 520 and 521. 3. Yes. See answer #1."

D. *Jury Verdict and Sentencing*

After receiving the further response to jury note number one, the jury deliberated for a few more hours before returning a verdict. The jury found Moreno guilty of first degree murder in violation of section 187, subdivision (a), and found true the allegation that he had intentionally and personally discharged a firearm proximately causing great bodily injury and death within the meaning of section 12022.53, subdivision (d). The trial court sentenced him to 25 years to life in prison on the murder conviction, with an additional 25 years to life in prison imposed consecutively for the enhancement.

## DISCUSSION

Moreno contends that his conviction must be reversed because (1) the trial court failed to read CALCRIM No. 640 to the jury; (2) the court incorrectly stated the law in its written response to the first jury note issued

11

during deliberations; and (3) even if each error is not sufficiently prejudicial on its own, the cumulative impact of the errors requires reversal.

*Standard of Review*

We review a claim of instructional error de novo. (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) The same standard of review applies to any supplemental instruction given in response to a jury question. (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887, fn. 4.)

*Analysis*

A. *The Court Did Not Commit Prejudicial Error by Failing to Orally Instruct Jury as to CALCRIM No. 640*

Moreno's first contention is that the trial court committed prejudicial error when it failed to read instruction CALCRIM No. 640 aloud to the jury along with the other instructions. The People respond that Moreno has forfeited this argument because he failed to object to the omission or bring it to the trial court's attention at the time it happened, and the manner of the instruction does not implicate his substantial rights. They further contend that even if the argument was not forfeited, there was no error, as the jury was provided with a written copy of CALCRIM No. 640.

We agree with the People that even if Moreno did not forfeit his contention regarding the trial court's failure to orally instruct the jury as to CALCRIM No. 640, there was no prejudicial error because the correct and complete written version of the instruction was given. For example, the Supreme Court has concluded that a trial court's failure to orally instruct the jury on the rule that it could not find a defendant had committed an unadjudicated offense based solely on uncorroborated accomplice testimony was "of no moment" because "[t]he court gave the jury a written instruction that properly and fully stated the law." (*People v. Bryant, Smith and Wheeler*

12

(2014) 60 Cal.4th 335, 454–455 (*Bryant*).)  The court explained: "Because ultimately the jury was properly instructed, we cannot conclude any error occurred . . . ." (*Id*. at p. 455.)  The Supreme Court has also found harmless error where a trial court orally instructed the jury with an incomplete version of a jury instruction (*People v. Garceau* (1993) 6 Cal.4th 140, 189 (*Garceau*) ["[t]he error was harmless, because the jury received the correct version of CALJIC No. 3.19 in its written form"]) and where it misread a word (*People v. Crittendon* (1994) 9 Cal.4th 83, 137–139 (*Crittendon*) [inadvertent misreading of instruction not prejudicial where it did not omit element and jury received correct written version of the instruction]).

In *People v. Mills* (2010) 48 Cal.4th 158 (*Mills*), the Supreme Court also found no reversible error where a trial court misread three different jury instructions, including one where the court inserted words into a legal definition in the instruction and thus "told the jury the opposite of the correct definition," because the jury received the correct instructions in written form. (*Id*. at p. 200.)  The Supreme Court concluded that "[t]he risk of a discrepancy between the orally delivered and the written instructions exists in every trial, and verdicts are not undermined by the mere fact the trial court misspoke." (*Ibid*.)  "We of course presume that jurors understand and follow the court's instructions.  This presumption includes the written instructions.  To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control." (*Id*. at pp. 200–201 [cleaned up].)

These cases are controlling here.  Although the trial court did not read CALCRIM No. 640 when giving oral instructions, the jury was given a "written instruction that properly and fully stated the law." (*Bryant, supra*, 60 Cal.4th at pp. 454–455; see also *Mills, supra*, 48 Cal.4th at pp. 200–201

13

[where "a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control"].) Moreover, the trial court told the jury: "[O]ne of the first things you should do is review in some detail the written instructions that you will have with you[.]"  After reading the instructions aloud, the court again advised the jury to review the written instructions: "I would urge you early on in your deliberations to take a look at these instructions in some detail.  You will have them in writing.  Take a look at them and see if you have any questions because I certainly will make every effort to make sure you have a complete understanding of the applicable law."  This further supports the conclusion that there was no prejudicial error.

Moreno resists this conclusion by relying heavily on *People v. Murillo* (1996) 47 Cal.App.4th 1104 (*Murillo*), where the Court of Appeal determined that the reasoning of *Garceau* and *Crittendon* does "not apply where the trial court fails to read an instruction it had said it would use." (*Murillo*, at p. 1107.)  The court there concluded: "Because it is not possible to determine if the jurors actually read their written copy of [the instruction], we must assume they did not, and approach the case as though the instruction was not given at all." (*Ibid*.)  Moreno urges us to apply the same logic here.

*Murillo* does not help Moreno for several reasons.  First, the *Murillo* court's statement that it must assume the jury did not read their written copy of the instruction at issue is contrary to well-settled law that we must " 'credit jurors with intelligence and common sense' . . . and presume they generally understand and follow instructions." (*People v. McKinnon* (2011) 52 Cal.4th 610, 670; see also *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 [in determining where there has been error in jury instructions, we must consider the instructions as a whole and assume that the jurors are

14

intelligent and capable of understanding and correlating all instructions given].)  Second, despite its conclusion that the court's failure to read the instruction was error, the *Murillo* court found the error harmless because, as here, the jury was given "other instructions covering essentially the same ground," and courts must view the instructions given as a whole.  (*Murillo, supra*, 47 Cal.App.4th at pp. 1108–1109.)

Most importantly, the *Murillo* decision was issued several years before the Supreme Court decided *Bryant* and *Mills*.  Moreno fails to address those holdings, which we must follow.  (*People v. Gonzales* (1993) 20 Cal.App.4th 1607, 1610 ["As an intermediate appellate court, we are bound to follow the precedent of our Supreme Court."].)  Instead, he vaguely argues that the People only cite cases holding that the misreading or partial omission of an instruction does not result in error when the jury receives a correct written copy of the same instruction, which he claims is distinguishable from the instant case.  The Supreme Court did not distinguish between the two scenarios, however, and we see no material difference between them.  If a trial court does not commit reversible error where it misreads multiple instructions, arguably confusing the jury (*Mills, supra*, 48 Cal.4th at p. 200), and it commits no error where it omits entire sentences from an instruction (*Garceau, supra*, 6 Cal.4th at p. 189), we cannot find error where it did not provide any incorrect instructions but merely neglected to read aloud a correct instruction that was given to the jury in writing.  This is particularly true where the court carefully reminded the jurors to review the written instructions early in their deliberations.  Here, as in *Bryant*, the "court gave the jury a written instruction that properly and fully stated the law." (*Bryant, supra*, 60 Cal.4th at p. 455.)  We therefore conclude the trial court

15

did not commit prejudicial error in failing to orally instruct the jury as to CALCRIM No. 640.

B. *Moreno Forfeited His Claim that the Trial Court's Responses to the Jury Question Constituted Prejudicial Error*

Moreno next contends the trial court erred by (1) incorrectly stating the law in its initial written response to a jury note during deliberations, and (2) when attempting to correct the error, failing to inform the jury it should disregard the initial response. The People do not dispute that the court's initial response incorrectly stated the law, but they argue that Moreno forfeited this argument because he agreed on both the initial response and the amended response that was sent to the jury after the prosecutor brought the error to the court's attention.

We again agree with the People. The Supreme Court has repeatedly held that where a defendant contends the trial court should have provided additional or different instructions in response to the jury's inquiry, "his counsel's acquiescence in the trial court's response forfeits the claim of error on appeal." (*People v. Rogers* (2006) 39 Cal.4th 826, 877 (*Rogers*); see also *People v. Castaneda* (2011) 51 Cal.4th 1292, 1352 (*Castaneda*) [defendant forfeited argument on appeal regarding trial court's purported instructional error "by agreeing with the trial court concerning the appropriate response to the jury's question"]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 (*Rodrigues*) ["Inasmuch as defendant both suggested and consented to the responses given by the court, the claim of error has been waived."].)

Here, the parties discussed the first proposed response to jury note number one at length. The jury's first note had three questions: (1) "In considering 1st degree murder, do we need to consider express v. implied malice?"; (2) "Is the definition of express malice the same as willful,

16

deliberate, and pre-meditated?"; and (3) "Do we have to unanimously agree on expressed [*sic*] v. Implied [malice] for 1st degree murder?" Defense counsel stated in response to the jury's questions: "I think the answer is yes, no, no." The trial court conferred with counsel for both parties, and everyone eventually agreed with the following response, which mirrored defense counsel's thoughts: "Responses to Jury Note #1: Question #1: Yes. See Cal Crim Instruction 520. Question #2: No. See Cal Crim instruction 521. Question #3: No[.]" Defense counsel thus agreed with the first, incorrect response.

When the parties appeared before the court the next morning, the prosecutor stated on the record that she believed the response to the jury was incorrect. The court stated the jurors had been advised "that they would be receiving further instructions from the Court" regarding their questions. After the prosecutor read her proposed language to the court, defense counsel stated: "Your Honor, we are in agreement with that proposed language to correct the misstatement made yesterday." The court thus adopted the prosecution's proposed response and sent the supplemental response to the jury. Defense counsel did not object to any part of this response, nor did he request to add any further clarification to it, including a supplemental instruction to the jury to disregard the previous response.[3] We must therefore conclude that this "acquiescence in the trial court's response forfeits the claim of error on appeal." (*Rogers, supra*, 39 Cal.4th at p. 877; see also

---

[3] The court and the parties apparently believed it was self-evident that the court's supplemental response superseded the first response, which is arguably supported by the fact that the supplemental response changed the "no" answer for question 3 to a "yes" answer. Although the issue is forfeited, we agree it would have been preferable for the trial court to explicitly instruct the jury to disregard the first response.

*Castaneda, supra*, 51 Cal.4th at p. 1352; *Rodrigues, supra*, 8 Cal.4th at p. 1193.)

DISPOSITION

The judgment is affirmed.

BUCHANAN, J.

WE CONCUR:

DATO, Acting P. J.

DO, J.